IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. CR-14-123-C |
| ) | |
| PAULA KLUDING, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THE UNITED STATES' RESPONSE TO DEFENDANT'S
MOTIONS REGARDING RESTITUTION**

Defendant Paula Kluding has filed two separate motions regarding the issue of restitution: (1) Motion for Evidentiary Hearing On The Issue Of $2,519,813.33 Restitution (Doc. 130, filed 6/16/15) and (2) Motion for Evidentiary Hearing On Responsibility Of Prairie View Hospice, A Corporation or Paula Kluding, An Individual for $2,519,813.33 Restitution Alleged (Doc. 131, filed 6/19/15).  The government responds to both motions herein.

**I.      Restitution to Medicare in the Amount of $2,519,813.33 Is Supported By A Preponderance of the Evidence and By Case Law.**

It is evident from Kluding's Motion for Evidentiary Hearing On The Issue Of $2,519,813.33 Restitution (Doc. 130) that she remains unclear on the government's

method of calculating restitution in this case.[1]  Although the government has previously provided a detailed explanation of its calculation to the Probation Officer and to defense counsel, the government will provide it again, as follows below, for clarity in the record.

    A.    **The Calculation of the Restitution Amount.**

The government has calculated Kluding's actual loss and restitution amount to be $2,519,813.33.  This amount was calculated as follows:

    1.    The government reviewed all of the patient files that were seized from Prairie View Hospice pursuant to a search warrant executed in June 2012.  The government identified all documents in each patient file that had been signed by either Registered Nurse Anita Hagerman or Certified Nurse Practitioner Michelle McGolden in a manner consistent with the evidence at trial that such documents had been falsified.  For instance, documents that pre-dated Anita Hagerman's employment with Prairie View Hospice, and documents that were signed during a pay period that Michelle McGolden did not work for Prairie View Hospice, were deemed to be false documents.  The government determined that 44 patient files contained false documentation.  The initials of these 44 patients are listed in the government's spreadsheet of false documents (Exhibit 1, hereto) and in the government's loss calculation spreadsheet (Exhibit 2,

---

[1] The figures cited in Kluding's motion are of unknown origin.  The government has not claimed that it reviewed 690 separate patient files. (*See* Doc. 130, at p. 2).  There are not 690 or 747 entries in the government's loss calculation spreadsheet. (*Id*.)  Despite the quotation marks in Kluding's motion, the government has never stated that it "'[c]an prove twenty three thousand one hundred fifty seven (23,157) separate illegal acts by Prairie View Hospice or Paula Kluding.'" (*Id*. at 6).

hereto). (Exhibit 1 and Exhibit 2 have been previously provided, unredacted, to Probation and defense counsel).

2. The government then determined the <u>earliest</u> false document in each of the 44 patient files. These 44 documents are listed in the government's spreadsheet of false documents by date, type of document, and reason that they were deemed false. (Exhibit 1). The false documents themselves are attached hereto as Exhibit 3 (Bates-labeled KLU-025284-KLU-025429) (previously provided, unredacted, to Probation and defense counsel).

3. The government obtained from Health Integrity (a government subcontractor that administers the Medicare program) a spreadsheet of all payments that Medicare made to Prairie View Hospice, organized alphabetically by patient name. With reference to this payment data, the government determined the claim period that would encompass the date of the earliest false document for each patient. As discussed further below, it is the government's position that all payments from that claim period forward until the end of Prairie View Hospice's service for the patient were fraudulently obtained by Kluding and thus represent actual loss to Medicare.

For instance, the earliest false document discovered for patient F.Ba. was an Interdisciplinary Team (IDT) Note signed by Anita Hagerman and dated 12/7/2010, which was before Hagerman's first day of employment with Prairie View Hospice, on 1/25/2011. (Exhibit 3, KLU-025284; Exhibit 1). The Medicare payment received by

Prairie View Hospice for F.Ba. for the claim period 12/1/2010-12/31/2010 and all subsequent payments forward to the end of service for F.Ba., (during claim period 6/1/2013-6/6/2013) were fraudulently obtained by Kluding and should be included in the restitution to Medicare.  (*See* Exhibit 2).

    4.    The government performed this analysis for each of the 44 patient files containing false documents.  The total of all of the payments that Kluding fraudulently obtained from Medicare was $2,519,813.33.  (*See* Exhibit 2, final page).  These payments span a time period of May 2010 through June 2013.

    5.    The government's restitution figure is entirely distinct from the Medicare Cap Overpayment amount.  The Medicare Cap Overpayment is a recoupment amount assessed administratively by Medicare when a hospice care provider has been reimbursed by Medicare in excess of a statutorily-determined annual amount.  There was testimony at trial regarding the Cap Overpayment amount for Prairie View Hospice, which for the years 2006-2010, totaled approximately $2.8 million.  Although this amount is similar in size to the government's restitution figure, the government is not, as Kluding claims, attempting to collect the Cap Overpayment.

**B.    Medicare Would Not Have Paid Prairie View Hospice for the Care of Certain Patients But For Kluding's Falsification of Documents. Thus, All Medicare Payments Subsequent to a Falsification Represent an Actual Loss to Medicare.**

Kluding was convicted of directing the falsification of medical documentation for hospice patients in order to pass a Medicare audit of the hospice's claims for reimbursement. The evidence presented at trial established the following:[2]

(1)    Palmetto (a Medicare subcontractor that administers the hospice program) initiated an audit of Prairie View Hospice because of the excessive length of stay of its patients. Excessive length of stay in an indicator that patients are not medically hospice eligible – *i.e.*, that they are not within approximately six months of dying.

(2)    Pursuant to the audit, Prairie View Hospice was required to submit medical documentation to Palmetto for various patients to justify their continued hospice care and payment by Medicare.

(3)    If Prairie View Hospice failed to submit adequate medical documentation for a given patient, Palmetto would discontinue payments to the hospice for that patient's care.

(4)    If Palmetto had known that Prairie View Hospice had falsified a patient's medical records, Palmetto would have discontinued Medicare payments to the hospice for that patient's care.

---

[2] The government has not ordered the transcript in this matter. However, testimony regarding items (1)-(4) was provided by Yvonne Luckie and Lori Strater. Testimony regarding item (5) was provided throughout trial.

(5)     Kluding directed the falsification of patient medical documents.  These falsified documents were maintained in the patient files and submitted to Palmetto to conceal the fact that certain patients of Prairie View Hospice had not received particular types of assessments and/or were not medically eligible to start or remain on hospice care.  Kluding directed the falsifications in order to continue receiving Medicare reimbursements for these patients.

This evidence supports the government's position that every payment by Medicare to Prairie View Hospice subsequent to the date of the first falsified document in a patient's file was obtained by Kluding's fraud and would not have been paid but for her fraud.  In other words, Kluding's falsification of documents for certain patients caused Prairie View Hospice to become *per se* ineligible for further Medicare payments.  The aggregate amount of the fraudulently obtained payments is the total actual loss and restitution due to the victim, Medicare.

The government's theory of calculating actual loss and restitution is in accord with the reasoning of the Sentencing Guidelines regarding the calculation of intended loss in health care fraud cases.  USSG § 2B1.1(3)(F)(viii) states:

> [i]n a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute *prima facie* evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted.

In hospice care, the amount of the bills **submitted** to Medicare is nearly identical to the amount actually **paid** by Medicare.

As case law makes clear – including case law quoted in Kluding's own motion – Kluding is not entitled to any "credit for legitimate services." Although Kluding attempts to distinguish *United States v. Triana*, 468 F.3d 308 (6th Cir. 2006), on narrow and irrelevant facts, the Sixth Circuit's reasoning is directly applicable here. In *Triana*, the defendant, a podiatrist, had been excluded from participating in the Medicare and Medicaid programs due to a previous conviction for health care fraud. However, he subsequently owned and operated two foot care companies under cover of straw owners. When the defendant was found guilty of health care fraud for the second time, the district court determined both the loss and restitution amounts at $1.7 million, which was the entire amount that the defendant's podiatry clinic received in reimbursements from Medicare. On appeal, defendant argued that the loss amount was improper because the services billed to Medicare were legitimate podiatric services for qualified Medicare participants, and thus Medicare had suffered no actual loss. The Sixth Circuit disagreed, holding,

> [defendant's] argument that the fact that each recipient of Footcare podiatric services was eligible to receive Medicare benefits meant that Medicare had not incurred a loss, fails to consider the important fact that [defendant's] participation in Footcare **made it ineligible for the receipt of *any* Medicare funds whatsoever, regardless of the services it provided.**
>
> . . .

> . . . . [T]he district court did not abuse its discretion in determining that [defendant's] actions caused an approximately $1.7 million "loss" to Medicare. . . . [Defendant] was excluded from participation in Medicare and Medicaid programs. By extension, [defendant's] substantial participation in Footcare made the company ineligible for participation in Medicare and Medicaid as well. Therefore, . . . [defendant's] attempt to divert Medicare funds to Footcare caused a loss to Medicare **regardless of whether Footcare hired legitimate podiatrists or provided services to legitimate Medicare beneficiaries.**

*Id.* at 321-323 (italic emphasis in original) (bold emphasis added).  In this case, it was Kluding's falsification of patient documents that made Prairie View Hospice ineligible to receive Medicare funds, regardless of whether the hospice provided any actual services to its patients.  Moreover, the evidence at trial showed that the patients for whom documents were falsified were medically ineligible to receive hospice services in any event, and thus Medicare would never have paid for any care for these patients.

Kluding's own motion contains a reference to *United States v. Jones*, 664 F.3d 966 (5th Cir. 2011), (*see* Doc. 130, at p. 6) which is also on directly point with the government's reasoning:

> no credit was warranted in *United States v. Jones* when the defendants billed Medicare for providing physical rehabilitation services, but fraudulently misrepresented the qualifications of the personnel who performed the work**. The district court awarded restitution to Medicare for the total amount it paid to the defendants, without giving any credit for the value of the physical therapy that was actually provided.** We affirmed because, although the patients may have received some therapeutic benefit, Medicare itself—not the patients—was the victim of the fraud and **would not have paid for any of the treatment absent those fraudulent misrepresentations.**

*United States v. Sharma*, 703 F.3d 318, 325 (5th Cir. 2012) (footnotes omitted) (emphasis added).[3]  Likewise, in the instant case, absent the fraudulent documentation created by Kluding and at her direction, Medicare would not have paid for hospice care for those patients.

For the foregoing reasons, the government has established restitution in the amount of $2,519,813.33 by a preponderance of the evidence.  *United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009).

## II.   Kluding Is Responsible for Paying Criminal Restitution.

In Kluding's Motion for Evidentiary Hearing On Responsibility Of Prairie View Hospice, A Corporation or Paula Kluding, An Individual for $2,519,813.33 Restitution Alleged (Doc. 131), she argues that she should not be responsible for paying criminal restitution in this matter because she committed her crimes while operating Prairie View Hospice, a legitimate corporation.  Citing state and federal <u>civil</u> case law, Kluding asserts

---

[3] The *Sharma* court distinguished *United States v. Klein*, 543 F.3d 206, 208–09 (5th Cir. 2008), in which the court granted the physician defendant a credit against restitution for the value of <u>medication</u> that would have been prescribed and reimbursed even absent the physician's fraud in billing the administration of the medication. *Sharma*, 703 F.3d at 324-25.  Moreover, in *Sharma* itself, the Fifth Circuit did <u>not</u> grant the defendants a credit for services and medications that were actually rendered.  The defendants were physicians who defrauded insurers by billing for pain injections that were never administered.  The court held that the district court did not abuse its discretion in declining to allow defendants a credit for trigger-point injections that were actually administered and that insurers allegedly would have paid for without "upcoding." The court held that the government provided sufficient evidence that the trigger-point injections were merely a revenue stream for defendants and not legitimate, medically necessary treatments for which insurers would have paid in absence of fraud, and defendants did not submit evidence refuting that conclusion. *Id*. at 326.

that it is the government's burden to pierce the corporate veil to obtain restitution from Kluding individually. She requests an evidentiary hearing on this issue. Kluding's argument is simply baffling.

Kluding was convicted of 39 health care fraud crimes. The payment of restitution is governed by 18 U.S.C. § 3663A, the Mandatory Victims Restitution Act of 1996 (MVRA), which "requires certain offenders to restore property lost by their victims as a result of the crime." *Robers v. United States*, — U.S. —, 134 S.Ct. 1854, 1856 (2014). "The MVRA requires that a defendant convicted of an offense against property, including any offense committed by fraud or deceit, be ordered to pay restitution to victims of the offense." *United States v. Howard*, 784 F.3d 745, 749-50 (10th Cir. 2015) (*see* 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii)). Kluding cannot avoid responsibility for her criminal conduct by hiding behind the corporate form of Prairie View Hospice.

The defendant in *United States v. Sullivan*, 2000 WL 1728124, 1 (9th Cir. 2000), made an analogous argument to Kluding's. He was convicted of mail fraud, making false statements and concealing material facts in connection with the receipt of benefits under the Federal Employee's Compensation Act, and bank fraud. *Id*. at *1. He appealed the convictions for mail fraud and making false statements, arguing that the district court erred in refusing to submit a "corporate veil" defense to the jury. The Ninth Circuit affirmed the convictions, holding simply that "a defendant may not use the corporate shield to protect himself from liability in a criminal proceeding." *Id*.

Numerous other courts are in agreement. "By personifying a corporation, the entity was forced to answer for its negligent acts and to shoulder financial responsibility for them. The fiction was never intended to prohibit the imposition of criminal liability by allowing a corporation or its agents to hide behind the identity of the other." *United States v. S & Vee Cartage Co., Inc.*, 704 F.2d 914, 920 (6th Cir. 1983) (internal citations omitted). "There is a world of difference between invoking the fiction of corporate personality to *subject* a corporation to civil liability for acts of its agents and invoking it to shield a corporation or its agents from criminal liability where its agents acted on its behalf." *United States v. Peters*, 732 F.2d 1004, 1008, n.7 (1st Cir. 1984) (emphasis in original) (upholding the convictions of two corporate officers because "the corporate veil does not shield them from criminal liability"). *See also United States v. Wise*, 370 U.S. 405, 417 (1962) (Harlan, J., concurring) (stating that "the fiction of corporate entity, operative to protect officers from contract liability, had never been applied as a shield against criminal prosecutions").

Accordingly, no evidentiary hearing on the issue of corporate form is necessary, and the Court should order Paula Kluding to pay restitution to Medicare in the amount of $2,519,813.33, which is the actual loss to Medicare from Kluding's fraudulent conduct.

Respectfully submitted,

SANFORD C. COATS
United States Attorney

s/ Amanda L. Maxfield Green
AMANDA L. MAXFIELD GREEN
Assistant U.S. Attorney
Oklahoma Bar No. 19876
210 W. Park Avenue, Suite 400
Oklahoma City, Oklahoma 73102
(405) 553-8770 (office)
(405) 553-8888 (fax)
amanda.green@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2015, I electronically transmitted this document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Jack Pointer, Jacquelyn Ford.

s/ Amanda L. Maxfield Green
Assistant U.S. Attorney